DARNLEY WASHINGTON AND LINZA COWANS v.
STATE OF ARKANSAS

5637                                473 S.W. 2d 157

Opinion delivered November 29, 1971

*Louis W. Rostek* and *William C. McArthur*, for appellants.

*Ray Thornton*, Attorney General; *Gene O'Daniel*, Asst. Atty. Gen., for appellee.

CARLETON HARRIS, Chief Justice. Appellants, Linza Cowans and Darnley Washington, were convicted of burglary and grand larceny by the Pulaski County Circuit Court (First Division) sitting as a jury, and each was sentenced to two years imprisonment on each count. From the judgment so entered, appellants appeal. The two were accused, along with several other defendants[1], of breaking into Laing's Service Company, and stealing five television sets, a stereo, a tape player, a transistor radio, and an air conditioner. Officer Seats, of the Little Rock Police Department, testified that a call came over the radio that the burglar alarm had gone off at Laings,

---

[1]Other defendants are not involved in this appeal.

and he made an investigation. A window on the south side of the building had been broken. Seats then looked over the general area, together with other officers who had come to the neighborhood. Some three or four blocks from the store, the officers noticed an old Pontiac automobile with the left side doors open, the engine warm, and they observed the lights on and heard people talking, in an apartment about 75 feet from where this car was parked. This of course was unusual, since it was between 3:00 and 4:00 a.m. Between the Pontiac and the apartment, five or six feet from the vehicle, the officers found a red merchandise tag which evidently had been attached to an electrical appliance. One of the officers took this tag back to the store, and Laing identified it as coming from his place of business. The officers then returned to the apartment, knocked several times, identified themselves, and the door was opened by an occupant of the apartment. Seats said that, on entering, he "observed several tv's, stereos, and air conditioners", and other electrical appliances sitting on the floor in plain view. There were five people present in the room, including the regular occupants of the premises, Charles Scott, his wife, and Cowans. In a bedroom at the rear, appellant Washington was found in bed with a woman named Charlotte Shackleford. Washington had on his pants and undershirt. The woman had on a slip or nightgown. All were taken to headquarters, and the articles, previously mentioned, were likewise taken to headquarters and were subsequently tagged.

We first discuss the evidence against Cowans. Here, two points are asserted for reversal, *viz*, that the court erred in allowing the state to impeach the testimony of its witness, Charlotte Shackleford, and erred in allowing the testimony of Mr. Laing concerning the identity of certain appliances "due to the fact that the property was not in court during trial and there was no testimony to identify the property belonging to Mr. Laing as being the property taken from the apartment".

Jess Hale, Sergeant at the Little Rock Police Department, testified that he interrogated Cowans, first advising him of his rights, likewise having a form setting

out these rights (according to *Miranda* v. *Arizona*, 384 U. S. 436) executed by Cowans. The officer testified that this waiver form was read to Cowans, and that the latter stated he understood what he was signing. In the statement, Cowans related that he, with others, including Darnley Washington, had been drinking all evening. He said that while they were riding around, he went to sleep; but awakened when someone told him that the window was broken out of the "T. V. place at Roosevelt and Louisiana". He said they all walked up to the front and he followed someone through the broken window and picked up a television, taking it back to the car and putting it in the front seat. They then went to the home of Scott, "took some stuff into the house" and he then went to sleep on the couch, awakening when the police knocked on the door. He related that Scott asked who was there, received the answer "Police" and that Scott then opened the door and several officers came into the room. In his statement, Cowans never did identify who was present at the time Laing's store was entered. In testifying before the court, this appellant stated that he passed out during the time the occupants of the car were driving around, and when he awakened, he was on a couch in the front room of Scott's apartment. He said that "they" brought in "some tv's" and that he went to a back room and laid down. When the others returned "they had some more stuff". "They" apparently meant Scott and a man named Carter since Cowans testified that Washington did not carry any of the merchandise into the room; in fact, he said he saw Washington in one of the bedrooms. Cowans, in testifying, denied that he went to Laing's Store, and said that he signed the statement because he was threatened by the officers, being told "I'll make it hard for you; I'll keep you here so you'll never get out". He stated that he signed the statement but didn't read it, and it wasn't read to him. However, there is no contention here that Cowans was threatened or that the statement was not voluntarily signed; nor is it argued that he signed the statement unaware of its content.

Charlotte Shackleford was in the Scott apartment when the officers arrived, and she was taken to head-

quarters where a statement was taken by Officers Baer and Harris. The officers testified that they advised her of her constitutional rights, and read the "rights" form to her; that she also read it and said that she understood it.[2] The officers said they advised Miss Shackleford how to commence the statement and then left the room and she knocked on the door when she finished writing it. In pertinent parts of the statement, i. e., that portion affecting appellants, she said that she was in bed, heard loud talking, ran to the window and looked out and saw all kinds of appliances; that Scott, Cowans, Carter and Darnley Washington came into the apartment with two television sets; that some twenty minutes later the officers arrived. When she testified in court, she said that about 7:00 p.m., Irma Scott, wife of Charles Scott, called her and asked her if she (Charlotte) would stay all night with Irma. She said she arrived at the apartment at about 9:30 p.m.; that they sat around until about midnight, went out and bought ice cream, came back and talked until about 1:30 p.m., at which time she went to bed. She then stated that between 3:00 and 4:00 a.m. Charles Scott, James Carter and appellant Cowans came in the door. Her testimony was somewhat different from the statement given although the difference principally related to the appellant Washington. The state then questioned Miss Shackleford about the differences in the statement and her testimony. It is urged that the prosecutor should not have been permitted to impeach his own witness. There is really no need to discuss this contention since her testimony was of no value to Cowans. The court announced that it was considering neither her statement nor her testimony, and the court's ruling can be easily understood because, even in her testimony, she made conflicting statements, depending upon whether she was being questioned by the prosecution or the defense. She clearly stated at the outset of her testimony that Cowans was one of three men who came in the door, and this testimony was reiterated. Subsequently, on cross-examination by Cowans' attorney, she said she didn't see Cowans come in. There is no merit in this point.

---

[2]Miss Shackleford was never charged as being implicated in the crime.

As to the second point, we do not agree that there was an insufficient identification of the property taken. This property had been taken from the apartment to the police station and tagged. Subsequently, Laing came to the station and recovered his property. The property that had been stolen was not offered in evidence at trial, and appellant Cowans argues that it was never shown that the property recovered from the police station by Laing was the same property which was taken to the station from the apartment by the officers. We disagree. Mr. Laing offered in evidence a list of the items that had been stolen from his store, showing model numbers and serial numbers. He also testified that these were the items that he recovered at the police office. It is true that not all of the officers who took the stolen articles to the station testified.[3] Detective Ridge testified that he helped in storing the stolen merchandise "put it on the evidence book and the tags on it". He said that a record of the serial numbers was made at the police station, "I imagine it would be on the property book". He stated that it would also be on the offense report; when asked if he made it out, he replied that he didn't and that it was made out by "Officer Morgan and me". Apparently he called off the numbers and Morgan recorded them. Officer Baer testified that the investigating officers had stored the property the night of the investigation. He was not present at that time but he did have the list, which shows five television sets, an RCA player, a Zenith stereo and a Whirlpool air conditioner. All of the serial numbers matched the numbers listed by Laing and all model numbers were the same except two. Laing had identified one television as Serial No. 73-BTB4081, model as EL, while the officer listed it as a DL, and the air conditioner was listed by Laing as serial No. 3966, model No. AVMP 50-20, and Baer listed it as ABMP 50-12. It will be noted that all serial numbers corresponded. So, we have definite evidence that Laing had certain merchandise stolen from him; that this merchandise was recovered by him at the police station where it had been brought by officers; that an official at the police station had the record of the items that had been brought in. We do not have the testimony of the officers who brought

---

[3]One was later killed.

in the stolen items (other than Detective Ridge who did not keep a personal record of the numbers), but we think the other evidence of identification supplies the defect. To say that the property was not properly identified would be to become rather technical in the face of the evidence mentioned. Accordingly, we have the testimony of the officers that Cowans was in the front room with the merchandise when the officers went in, and the statement by Cowans in which he admitted participation in the burglary. This evidence was sufficient to convict, and finding no error in the points asserted, the conviction of Cowans will be affirmed.

As to Washington, it is argued that the evidence confiscated by the officers was obtained by an illegal search and seizure and was thus a violation of Washington's constitutional rights, and further, that the testimony was insufficient for conviction of this appellant. Since we feel that the evidence was insufficient to sustain the conviction, there is really no need to discuss appellant's first point, although we find it to be without merit. Based on the circumstances outlined previously, we think that the officers had reasonable grounds to believe that appellants had committed a felony; further, the officers were voluntarily admitted by either Scott, or his wife,[4] and if by the latter, in Scott's presence.

When the statement of Charlotte Shackleford is eliminated, the evidence of Washington's participation is insufficient to sustain the conviction. In her statement, she had said that Washington had come in with the others, and that, upon arrival of the officers, had jumped in her bed, and requested her to state that he had been there all night. As previously stated, this statement was not considered by the court, which action was correct. The result is that we have Washington in the apartment, but no evidence that he came into the apartment with the others, or participated in the burglary, or assisted in transportation of the stolen articles. Cowans did not definitely involve Washington and, according to the officers, he was not in the front room when they entered. In addition to his being present in the apartment, we

[4]There was evidence that each had opened the door.

have only the circumstance that he was in bed, partly dressed, when apprehended. Appellant, after detailing his activities earlier in the evening, when he had been with the others, testified that he had left them about 12:30 a.m., being driven to the home of his brother, Wadell Washington.

"I got out, went to the house, all right. You know they had the upstairs and downstairs, the bedroom was upstairs. I hollered for my sister-in-law to come and open the door. She said, okay; she be down in a minute. I went around on the front porch, and I sat there for awhile and I had been drinking so I went on to sleep."

He said that when he awakened, he found that the door had not been unlocked, and since he was to work the next day with his father, decided to go on home. In passing Scott's apartment, he saw the light, and stopped to request someone to take him home. He testified that he went in and asked Carter to take him home. Carter replied that he would take him in a few minutes, and he went to the bedroom to talk with Charlotte while he was waiting. About twenty minutes later, the officers arrived. Washington testified that he saw the "tv's and stuff" when he entered the apartment.

While one might have good reason to suspect Washington as one of those involved, suspicion cannot take the place of evidence, and we do not think, under the facts presented, that it can be said that there was substantial evidence to support the verdict.

In accordance with what has been said, finding no reversible error, the judgment of conviction of Cowans is affirmed; as to Washington, the judgment of conviction is reversed, and the cause remanded.

It is so ordered.